

## NUMBER 13-08-00308-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

**BRIAN L. FULLER,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

**On appeal from the 105th District Court of Nueces County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides**
**Memorandum Opinion by Justice Benavides**

Appellant, Brian L. Fuller, appeals from a conviction for tampering with a governmental record. *See* TEX. PENAL CODE ANN. § 37.10(a)(5) (Vernon Supp. 2008). After a bench trial, the trial court found that Fuller made, used, or presented a governmental record with knowledge of its falsity with the intent to harm or defraud another, and sentenced him to eight years' imprisonment and imposed a $1,000 fine. *See id.* § 37.10(d)(3). Fuller appeals, asserting that (1) the trial court committed fundamental

error by admitting unobjected-to hearsay; and (2) the evidence is legally and factually insufficient. We affirm.

## I. BACKGROUND

On August 19, 2006, Officer Patrick McMenemy observed a truck fail to stop while exiting the private driveway of an apartment complex. He stopped the vehicle, which was driven by Fuller. Upon the officer's request, Fuller presented his driver's license and an insurance card to Officer McMenemy. Officer McMenemy recognized the name of the insurance agent listed on the card, which made him suspicious of the validity of the insurance coverage allegedly represented by the card. He ultimately concluded the card was false.

In his trial testimony, Officer McMenemy discussed how he arrived at the conclusion that the card was false. First, he noted that approximately one month before he stopped Fuller, his partner, Officer Uribe, performed a traffic stop during which he was presented with an insurance card from the same insurance agent, "W.B. Stanton Insurance Agency." Following Officer Uribe's investigation, that card was determined to be false. Officer McMenemy also stated that, to him, the card Fuller presented looked as though it was a photocopied blank form on which Fuller's information had been entered with a typewriter. He testified that "that's not what I normally see as a patrol officer from the insurance cards."

Officer McMenemy called for another unit, and Officer Uribe, among others, arrived at the scene. All of the officers looked at the card Fuller had given to Officer McMenemy, and "went ahead and called the insurance company just to verify the 1-800 number and entered the automated policy and once we entered the policy number, they told us that it

2

was an invalid policy." Fuller did not object to this hearsay.

Following the phone call, Officer McMenemy compared the vehicle identification number on Fuller's truck and on the card. He discovered that the fourth character on the card did not match the fourth number on the vehicle: the card contained the letter "O," but the vehicle had the letter "D."[1]

Officer McMenemy advised Fuller of his *Miranda* rights, and Fuller agreed to speak with him. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Officer McMenemy testified without objection that Fuller told him that "he purchased the papers, that they were fake," and from whom Fuller purchased them.[2] Fuller executed a written statement, which Officer McMenemy read into the record. Fuller's written statement confirmed Fuller's source for the card and noted that he paid $25 for it. It also stated that the person who gave Fuller the card would take a "blank" copy and then would "type[ ] them out on a typewriter." Notably, Fuller's written statement does not contain any indication of his knowledge concerning the authenticity of the card, and the statement does not contain any affirmation that he knew the card was fake or that he had told Officer McMenemy that the card was fake.

After reading Fuller's written statement into the record, in response to the State's questioning, Officer McMenemy testified that Fuller, in his written statement, "acknowledge[d] that he knew [the card was] forged . . . ." Fuller did not object to this mischaracterization of his written statement.

---

[1] In a twist of irony, Sergeant Zepeda, who signed the complaint against Fuller, made a transcription error in the complaint whereby he, presumably inadvertently, entered a "1" in the vehicle identification number where a "5" should have been.

[2] Fuller's source for the card was the wife of the person who presented the false card to Officer Uribe the month before Fuller's arrest.

3

Debbie Fuller, an office manager and Fuller's daughter, testified on his behalf. She noted that it was her job to arrange for liability insurance for her employer's company vehicles. As such, she reviews insurance cards similar to the card Fuller presented to Officer McMenemy. That card, she noted, looked "very, very similar to the ones that she downloads [from her company's liability insurance carrier] . . ." for use with her employer's vehicles.

Fuller testified that, when he presented the card to Officer McMenemy, he did not know the card was false. He received the card from the people with whom he was staying. They told him that, for $25 a month, they could add him to their insurance. He paid, and he received an insurance card showing his truck as the covered vehicle. Fuller also stated that he did not intend to harm or defraud Officer McMenemy when he presented the card to the officer. He did not know the card was false until Officer McMenemy told him about the previous case wherein Officer Uribe determined a card listing the same agent's name was fake.

On cross examination, Fuller stated that he did not call the insurance carrier to verify the card because "the people that I got this card from, he [sic] owned a septic tank business[,] and he [sic] said that he [sic] had a lot of insurance and [that] it wouldn't cost very much to add me on." On re-direct examination, Fuller testified that he had two prior felonies, had "been to T.D.C.," had been released in January of 2006, would not like going back to prison, and "would have [taken] a no insurance [ticket] in a heartbeat" instead of doing "something as stupid as presenting an officer with a false insurance card."

The trial judge found Fuller guilty of tampering with a governmental record with the intent to harm or defraud another. *See* TEX. PENAL CODE ANN. § 37.10(a)(5), (d)(3). This

4

appeal ensued.

## II. UNOBJECTED-TO HEARSAY

In his first issue, Fuller argues that "[t]he trial court committed fundamental error by allowing hearsay as the only direct evidence of an element of the crime." *See* TEX. R. EVID. 103(d) ("In a criminal case, nothing in these rules precludes taking notice of fundamental errors affecting substantial rights although they were not brought to the attention of the court."). Section 37.10 of the penal code provides that a person commits the offense of "Tampering with [a] Government Record" if he "makes, presents, or uses a governmental record with knowledge of its falsity." TEX. PENAL CODE ANN. § 37.10(a)(5). A "government record" includes "a standard proof of motor vehicle liability insurance form . . ., a certificate of an insurance company . . ., [or] a document purporting to be such a form or certificate that is not issued by an insurer authorized to write motor vehicle liability insurance [in Texas] . . . ," among other things. *Id.* § 37.01(2)(D) (Vernon Supp. 2008). Fuller asserts that the only evidence regarding whether the insurance card was a false government record was "the fact that an unknown officer ('we') called an insurance company's automated line and heard that the policy was invalid."

Officer McMenemy testified that he contacted three other officers, including Officer Uribe. When all three arrived at the scene, they looked at the insurance card. "Upon looking at it, we went ahead and called the insurance company just to verify the 1-800 number and entered the automated policy [sic] and once we entered the policy number, they told us that it was an invalid policy." Fuller did not object to this testimony and now argues on appeal that "[w]hat a computer from the insurance company told the officers is" hearsay. *See* TEX. R. EVID. 801(d) ("'Hearsay' is a statement, other than one made by the

5

declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

Under this issue, Fuller also argues that the "statement violates [his] constitutional right to confront witnesses, as set forth under *Crawford*." *See Stringer v. State*, 276 S.W.3d 95, 99 (Tex. App.–Fort Worth 2008, pet. granted) (noting that the Confrontation Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'") (quoting *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (internal citations omitted)). Fuller contends that he "should have had the opportunity to confront the agent of the insurance company to confirm or deny whether the policy was valid."

## A.    Applicable Law

Depending on the specific right asserted, the general error preservation rule requires a party to present a timely, specific objection and obtain a ruling by the trial court. *See* TEX. R. APP. P. 33.1; *Mendez v. State*, 138 S.W.3d 334, 340-41 (Tex. Crim. App. 2004) (summarizing rule 33.1(a) and delineating "systemic requirements," "waivable rights," and "forfeitable rights"). Most evidentiary and procedural rights are "forfeitable," that is, the party must request them in order to exercise them, and the right is forfeited unless exercised. *Mendez*, 138 S.W.3d at 340-41. The general preservation rule applies to these rights. *Id.* at 341.

"Systemic requirements" are not necessarily constitutional, but are most often "'laws affecting the jurisdiction of the courts,' specifically, jurisdiction of the subject and jurisdiction of the person," *Id.* (citing *Marin v. State*, 851 S.W.2d 275, 279 (Tex. Crim. App. 1993)).

6

"Waivable rights" are those "'rights of litigants which must be implemented by the system unless expressly waived.'" *Id.* at 341; *see Saldano v. State*, 70 S.W.3d 873, 888 (Tex. Crim. App. 2002) (noting that "waivable rights" include the right to trial by jury and the right to assistance of counsel). Systemic requirements and waivable rights are generally referred to as "fundamental" and do not fall under the general preservation rule, i.e., they may be raised for the first time on appeal. *Id.*

In *Saldano*, the court of criminal appeals stated, "[w]e have consistently held that the failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence. This is true even though the error may concern a constitutional right of the defendant." 70 S.W.3d at 889; *see also Stearns v. State*, No. 13-05-112-CR, 2007 WL 2142651, at *1 (Tex. App.–Corpus Christi July 26, 2007, no pet.) (mem. op., not designated for publication). "[A]ll existing authority holds the admission of hearsay must be preserved with a timely and specific objection to the evidence." *Moore v. State*, 935 S.W.2d 124, 130 (Tex. Crim. App. 1996) (citing *Tuner v. State*, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991) (stating the general rule for error preservation)). To preserve error on confrontation clause grounds, the general preservation rule must be followed. *Acevedo v. State*, 255 S.W.3d 162, 173 (Tex. App.–San Antonio 2008, pet. ref'd); *see Paredes v. State*, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004) (holding that appellant waived his confrontation clause argument on appeal by not objecting on those grounds in the trial court); *Dewberry v. State*, 4 S.W.3d 735, 752 n.16 (Tex. Crim. App. 1999) (same) (citing *Briggs v. State*, 789 S.W.2d 918, 923 (Tex. Crim. App. 1990) (noting that constitutional error may be waived)).

Fuller asks this Court to create an exception to the court of criminal appeals's

jurisprudence by holding that, when the hearsay evidence, admitted without objection, is the only evidence regarding an element of the State's case and amounts to a violation of the confrontation clause, the error in admitting the evidence is fundamental and may be raised for the first time on appeal.[3] We decline to do so.

**B.     Analysis**

Officer McMenemy's statement that "we went ahead and called the insurance company just to verify the 1-800 number and entered the automated policy [sic] and once we entered the policy number, they told us that it was an invalid policy" is certainly hearsay. *See* Tex. R. Evid. 801(d). What "they told us" was an out-of-court statement, offered to prove that the policy Fuller handed to Officer McMenemy was invalid, and thus a false government document. *See* Tex. Penal Code Ann. § 37.01(2)(D). Fuller was not afforded an opportunity to cross-examine "they" to test the trustworthiness of the statement. *See Crawford*, 541 U.S. at 51. Both arguments related to the admissibility of evidence, and the court of criminal appeals has "consistently held that the failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence. This is true even though the error may concern a constitutional right of the defendant." *Saldano*, 70 S.W.3d at 889. We adhere to court of criminal appeals's precedent and hold that the trial court did not commit fundamental error, and Fuller waived this issue by failing to object to this testimony in the trial court.[4]

---

[3] Fuller candidly recognizes that, standing alone, admission of a hearsay statement and a violation of the Confrontation Clause do not amount to fundamental error. *See Paredes v. State*, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004); *Moore v. State*, 935 S.W.2d 124, 130 (Tex. Crim. App. 1996).

[4] The State argues that this hearsay was not the only evidence that Fuller provided a false government record to Office McMenemy, noting in a different section in its brief that Officer McMenemy also testified that Fuller told him the insurance card was "fake." In a footnote, Fuller asserts that, under article 38.22 section 3 of the code of criminal procedure, and because it conflicts with his written statement and testimony, this statement was not admissible. *See* Tex. Code Crim. P. Ann. art. 38.22 § 3 (Vernon 2005). To the extent

8

## III. SUFFICIENCY OF THE EVIDENCE

In his second issue, Fuller contends that the evidence is both legally and factually insufficient to support the trial court's ruling.

## A.    Standards of Review

When reviewing the legal sufficiency of the evidence, we examine all of the evidence in the light most favorable to the judgment to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). Without re-weighing the evidence or substituting our judgment for the fact-finder's, we review all of the evidence presented at trial. *Utomi v. State*, 243 S.W.3d 75, 78 (Tex. App.–Houston [1st Dist.] 2007, pet. ref'd) (citing *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). We evaluate all of the evidence in the record, whether direct, circumstantial, admissible, or inadmissible. *See Tottenham v. State*, 285 S.W.3d 19, 25 (Tex. App.–Houston [1st Dist.] 2009, pet. ref'd) (citing *Dewberry*, 4 S.W.3d at 740).

In a factual sufficiency review, we review the evidence in a neutral light. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We will set aside the verdict "only if the evidence supporting the verdict is so weak as to render the verdict clearly wrong or manifestly unjust" or the "verdict is against the great weight and preponderance of the evidence." *Id.* Giving deference to the fact-finder, we "must be cognizant of the fact that a [fact-finder] has already passed on the facts and must give due

---

Fuller raised an issue regarding the admissibility of Fuller's "fake" comment to Officer McMenemy, we continue to follow the court of criminal appeals's precedent and conclude that, by not objecting in the trial court, Fuller waived this issue. *See Saldano*, 70 S.W.3d at 889.

deference to the determinations of the [fact-finder]" in order to "avoid substituting [our] judgment for that of the [fact-finder]." *Id.* We will not reverse the fact-finder's decision unless, based upon some objective evidence in the record, we can say that the great weight and preponderance of the evidence contradicts the verdict. *Watson v. State*, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006). "[W]e cannot conclude that a conviction is 'clearly wrong' or 'manifestly unjust' simply because, on the quantum of evidence admitted, we would have voted to acquit had we been" the fact-finder. *Tottenham*, 285 S.W.3d at 26 (quoting *Watson*, 204 S.W.3d at 417). We must also discuss the evidence that the appellant asserts most undermines the verdict. *Id.*

### B. Applicable Law

Both legal and factual sufficiency are measured by the elements of the crime as defined by the hypothetically correct jury charge. *Malik v. State*, 952 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, no pet.). The hypothetically correct charge accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Gollihar v. State*, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); *Malik*, 953 S.W.2d at 240.

Section 37.10(a)(5) of the penal code provides that a person commits the offense of tampering with a governmental record when that person "makes, presents, or uses a governmental record with knowledge of its falsity . . . ." Tex. Penal Code Ann. § 37.10(a)(5). The punishment for tampering with a governmental record is elevated to a second-degree felony "if it is shown on the trial of the offense that the governmental record is" a "standard proof of motor vehicle liability insurance form" when the "actor's intent in

10

committing the offense was to defraud or harm another." *Id.* § 37.10(a)(5), (d)(2); *see id.* § 37.01(2)(D) (defining "governmental record" to include a "standard proof of motor vehicle liability insurance form"); TEX. TRANSP. CODE ANN. § 601.081 (Vernon 1999) (describing the required contents of a "standard proof of motor vehicle liability insurance form"). The penal code defines "knowledge" in the following manner:

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

TEX. PENAL CODE ANN. § 6.03(b) (Vernon 2003). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a).

Therefore, to find Fuller guilty of the second-degree felony of tampering with a governmental record, the fact-finder must have found that Fuller: (1) made, used, or presented; (2) a governmental record; (3) with knowledge of its falsity; and (4) with the intent to harm or defraud another. *See Tottenham*, 285 S.W.3d at 27.

**C. Analysis**

**1. False Government Record**

Fuller argues that the evidence is legally and factually insufficient to support the conclusion that the insurance card was a false government record and that he knew it was false. Quoting the penal code, Fuller claims that the State failed to prove that the insurance card was "not issued by an insurer" and was therefore a false government record. *See* TEX. PENAL CODE ANN. § 37.01(2)(D) (defining governmental record to include, among other items, a document purporting to be a standard proof of insurance form but

11

that was not issued by an insurer authorized to issue such insurance).

The penal code defines "governmental record" to include five types of documents, in the context of proof of motor vehicle liability insurance. *Id.* Three types are relevant to this case: (1) "a standard proof of motor vehicle liability insurance described by Section 601.081, Transportation Code;" (2) "a certificate of an insurance company described by Section 601.083" of the transportation code; and (3) "a document purporting to be such a form or certificate that is not issued by an insurer authorized to write motor vehicle liability insurance in this state." Fuller was indicted for making, using, and presenting a false "standard proof of motor vehicle liability insurance form." *Id.* Thus, his reliance on the definition provided in (3) above is misplaced. We will consider the sufficiency of the evidence regarding whether the document Fuller gave to Officer McMenemy was a false standard proof of motor vehicle liability insurance form.

There is no dispute that the card Fuller handed to McMenemy was a motor vehicle liability insurance form containing the statutorily-required information. *See* TEX. TRANSP. CODE ANN. § 601.081 (listing the information that must be included in the "standard proof of motor vehicle liability insurance form prescribed by the Texas Department of Insurance"). A disagreement arises regarding whether the card was false and whether Fuller knew, at the time he presented the card to Officer McMenemy, that he was giving the officer a false insurance card.

Officer McMenemy discussed how he arrived at the conclusion that the card was false. First, he noted that approximately one month before he stopped Fuller, his partner, Officer Uribe, performed a traffic stop during which he was presented with an insurance card from the same insurance agent, "W.B. Stanton Insurance Agency." Following Officer

Uribe's investigation, that card was determined to be false. Officer McMenemy also stated that, to him, the card Fuller presented looked as though it was a blank form, that had been photocopied, and then Fuller's information was entered with a typewriter. He testified that "that's not what I normally see as a patrol officer from the insurance cards."

Officer McMenemy called for another unit, and Officer Uribe, among others, arrived at the scene. All of the officers looked at the card Fuller had given to Officer McMenemy, and "went ahead and called the insurance company just to verify the 1-800 number and entered the automated policy and once we entered the policy number, they told us that it was an invalid policy." As noted previously, Fuller did not object to this hearsay. Additionally, Office McMenemy did not identify what number was entered: the policy lists the policy number as "TX.0081469," yet there was no testimony indicating whether the number entered included the "TX." No testimony from the insurance agency, the insurance carrier, or any answering service was presented.

Following the phone call, Officer McMenemy compared the vehicle identification number on Fuller's truck and on the card and discovered that the numbers did not match: the card contained the letter "O," but the vehicle had the letter "D."

After being advised of his *Miranda* rights, Fuller agreed to speak with Officer McMenemy. Officer McMenemy testified without objection that Fuller told him that that "he purchased the papers, that they were fake," and from whom Fuller purchased them. Officer McMenemy read Fuller's voluntary written statement into the record. Fuller's written statement confirmed Fuller's source for the card and that he paid $25 for it. It also stated that the person who gave Fuller the card would take a "blank" copy and then would "type[] them out on a typewriter." In the statement, Fuller makes no mention of his knowledge

13

regarding the validity of the card, which appears to contradict Officer McMenemy's testimony that Fuller told him the card was "fake."

After Officer McMenemy read Fuller's written statement into the record, the State asked the officer, "So, in this particular statement [sic] the Defendant did—did acknowledge that he knew they were forged, the paper; is that correct?" Officer McMenemy stated, "Yes, sir." Fuller did not object to this testimony.[5]

Debbie Fuller testified that, based on her experience arranging for insurance for her employer's vehicles, the card Fuller gave Office McMenemy looked "very, very similar to the ones that she downloads [from her company's liability insurance carrier] . . . ."

Fuller testified that he did not know the card was false until Officer McMenemy told him about the previous case wherein Officer Uribe determined a similar card was fake. He only knew that, for $25 per month, the people with whom he was staying added him to their insurance plan, that the wife took a blank form and typed in his information, and that he then received from her an insurance card purporting to provide liability insurance coverage for his truck.

Fuller stated that he did not call the insurance carrier to verify the card because "the people that I got this card from, he [sic] owned a septic tank business and he said that he [sic] had a lot of insurance and it wouldn't cost very much to add me on." The fact that the

---

[5] On appeal, Fuller does not assert that he received ineffective assistance of counsel by his counsel's failure to object to Officer's McMenemy's statement that Fuller told him the card was "fake" or to Officer McMenemy's mischaracterization of Fuller's written statement. *See Ex parte Amezquita*, 223 S.W.3d 363, 366 (Tex. Crim. App. 2006) (noting that counsel's performance is ineffective when it "'was deficient and that a probability exists, sufficient to undermine our confidence in the result, that the outcome would have been different but for counsel['s] deficient performance.'" (citing *Ex parte White*, 160 S.W.3d 46, 49 (Tex. Crim. App. 2004)); Tex. Code Crim. Proc. Ann. art. 38.22 § 3 ("No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding . . . ."). Thus, such a contention is not presently before us.

monthly price was only $25 did not prompt Fuller to call the carrier to confirm his coverage. Fuller testified that, with two prior felonies and having "been to T.D.C.," that he "would have [taken] a no insurance [ticket] in a heartbeat" instead of doing "something as stupid as presenting an officer with a false insurance card."

Applying the applicable standards of review, we conclude that the evidence is legally and factually sufficient to support the judgment that Fuller knew he was presenting a false government document to Officer McMenemy. *See Hooper*, 214 S.W.3d at 13; *Lancon*, 253 S.W.3d at 705; *Watson*, 204 S.W.3d at 417. On two occasions, Officer McMenemy testified, without objection, that Fuller acknowledged the card was "fake." Though in conflict with his written statement, this direct evidence indicates that Fuller knew that the card he was handing Office McMenemy was a false insurance card. *See Watson*, 204 S.W.3d at 440 n.120 ("In bench trials, of course, it is the trial judge who is the sole factfinder, and his credibility and weight determinations are entitled to the same deference as that given to a jury."). Additionally, Officer McMenemy testified that, based on his partner's prior experience with an insurance card from the same agent, he concluded that the insurance card was false.

The circumstantial evidence is also legally and factually sufficient to support the judgment that Fuller knowingly presented a false insurance card. Fuller acknowledged watching his host's wife type his information into a blank form, which she drew from a stack of blank forms she had. The insurance card he had did not have the correct vehicle identification number on it. Additionally, the officers were unable to verify the policy's validity with the insurance company. However, Fuller testified that he did not know that the card was false until Officer McMenemy told him so. Again, it is not for us to resolve these

15

testimonial conflicts.  *See id.*  We overrule Fuller's arguments on this point.

### 2. Intent to Defraud or Harm

Fuller next argues that the evidence is legally and factually insufficient to support the conclusion that he intended to defraud or harm Office McMenemy.  Fuller asserts that there is no evidence of harm and no evidence of an intent to defraud Officer McMenemy.

### a. *Harm*

The penal code defines "harm" as "anything reasonably regarded as loss, disadvantage, or injury, including harm to another person in whose welfare the person affected is interested."  TEX. PENAL CODE ANN. § 1.07(a)(25) (Vernon Supp. 2008).  Harm does not require a showing of damage to one's pecuniary interests.  *See Briones v. State*, 76 S.W.3d 591, 596 (Tex. App.–Corpus Christi 2002, no pet.).

In the context of automobile searches and seizures, the Supreme Court has recognized that police officers have functions beyond merely ticketing those who violate traffic laws.  *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).  The Court of Criminal Appeals has explained that part of an officer's duty is to "investigate accidents—where there is often no claim of criminal liability—to direct traffic and to perform other duties that can best be described as 'community caretaking functions.'"  *Wright v. State*, 7 S.W.3d 148, 151 (Tex. Crim. App. 1999) (en banc) (citing *Cady*, 413 U.S. at 441).  The San Antonio Court of Appeals has indicated that police officers have an interest in "protecting the welfare of other motorists."  *See also State v. Gollihar*, No. 04-07-00623-CR, 2008 WL 2602095, at *2 (Tex. App.–San Antonio July 2. 2008, pet. granted) (mem. op., not designated for publication). Additionally, the Houston Fourteenth District Court of Appeals has noted that

> The requirement that drivers carry proof of insurance protects other motorists from financial loss caused by collisions with uninsured motorists. Because it is required by law, drivers are entitled to expect other motor vehicle operators to have such insurance coverage. To the extent a driver evades this requirement by obtaining a false proof of insurance form, other motorists are defrauded and subjected to harm in the form of a greater risk of financial loss due to the uninsured driver. A person who knowingly supplies such a false insurance form is equally responsible for this fraud and harm.

*Helling v. State*, Nos. 14-96-01153-CR, 14-96-01154-CR, 14-96-01155-CR, 1998 WL 833819, at *2 (Tex. App.–Hous. [14th Dist.] Dec. 03, 1998, no pet.) (not designated for publication) (internal citations omitted) (citing TEX. TRANSP. CODE ANN. § 601.002(3)(B) (Vernon Supp. 1998)). Under this line of cases then, a police officer can be harmed in two ways by a driver presenting a false insurance card: (1) the officer must "take additional actions;" and (2) "other motorists in whose welfare [the officer is] interested" are also harmed. *See also Gollihar*, 2008 WL 2602095, at *2; TEX. PENAL CODE ANN. § 1.07(a)(25) (defining "harm" to include "harm to another person in whose welfare the person affected is interested").

In the present case, the evidence indicated that Fuller gave Officer McMenemy a false insurance card. Because he believed the card was false, Officer McMenemy had to undertake additional actions, including an investigation. Additionally, Officer McMenemy was disadvantaged because "other motorists in whose welfare [he] was interested were harmed" by Fuller providing a false insurance card. *See also Gollihar*, 2008 WL 2602095, at *2; *Helling*, 1998 WL 833819, at *2. We conclude that the evidence is legally and factually sufficient to indicate that Officer McMenemy was harmed by Fuller's action.

### b.     *Intent to Defraud*

Fuller next asserts that there is "[n]o proof of intent to defraud Officer McMenemy." Fuller contends that "it is undisputed that Officer McMenemy was not induced to act by the

17

presentation of the card or that he refrained from acting by the presentation of the card." *See Martinez v. State*, 6 S.W.3d 674, 678 (Tex. App.–Corpus Christi 1999, no pet.) ("Intent to defraud has been defined as the intent to cause another to rely upon the falsity of a representation, such that the other person is induced to act or to refrain from acting."). Intent to harm or defraud may be proven by circumstantial evidence. *Wingo v. State*, 143 S.W.3d 178, 187 (Tex. App.–San Antonio 2004), *aff'd,* 189 S.W.3d 270 (Tex. Crim. App. 2006).

Here, the evidence indicated that Fuller presented a false insurance card to Officer McMenemy. The fact-finder may infer intent from Fuller's words and actions. *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991)*,overruled in part on other grounds by Fuller v. State*, 829 S.W.2d 191 (Tex. Crim. App. 1992). "By producing the false insurance card, [Fuller] intended to cause [Officer McMenemy] to rely upon its falsity and refrain from ticketing [him]." *See Gollihar*, 2008 WL 2602095, at *2. We conclude that the evidence is legally and factually sufficient to support the finding that Fuller intended to defraud Officer McMenemy. We overrule Fuller's second issue.

## IV. CONCLUSION

Having overruled Fuller's issues, we affirm the judgment of the trial court.

GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and
filed this the 31st day of August, 2009.

18